IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD GUIDAS,<br><br>                            *Plaintiff,*<br><br>v.<br><br>UNITED STATES STEEL CORPORATION,<br><br>                            *Defendant.* | Civil Action No. 2:24-cv-305<br><br>Hon. William S. Stickman IV |

## MEMORANDUM OPINION

WILLIAM S. STICKMAN IV, United States District Judge

Plaintiff Ronald Guidas ("Guidas") filed this putative class action under the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101 *et seq.*, against United States Steel Corporation ("U.S. Steel") in the Court of Common Pleas of Allegheny County, Pennsylvania. In the single-count complaint ("Complaint"), Guidas asserts, on behalf of himself and others similarly situated, that U.S. Steel violated the PMWA by failing to pay overtime wages to hourly employees for activities they performed before their scheduled start time and after their scheduled end time. (ECF No. 1-2, p. 12). U.S. Steel removed the case to this Court on the basis of preemption under Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185. (ECF No. 1). Guidas filed a Motion to Remand to State Court, asserting that U.S. Steel did not satisfy its burden of proving that his claim is preempted. (ECF No. 7). U.S. Steel then filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Guidas's PMWA claim is preempted by Section 301 of the LMRA. (ECF No. 10). For the reasons discussed below, the Court holds that Guidas's PMWA claim is not preempted.

1

Guidas's motion will be granted, and the case will be remanded to state court. U.S. Steel's motion to dismiss will be denied as moot.

## I. FACTUAL BACKGROUND

U.S. Steel owns and operates Mon Valley Works, "an integrated steelmaking operation" comprised of four facilities: the Clairton Plant, the Edgar Thomson Plant, the Irvin Plant, and the Fairless Plant. (ECF No. 1-2, p. 8). Guidas is an hourly employee at the Clairton Plant (the "Plant"), where he has worked as a "Mechanical Repairman" for the last twenty-two years. (*Id.*). In addition to Guidas, U.S. Steel employs other "individuals who have been paid an hourly wage to perform work at the Clairton Plant" ("Hourly Employees"). (*Id.*).

Guidas and the Hourly Employees' work at the Plant is governed by a Basic Labor Agreement ("BLA"), which is a collective bargaining agreement to which U.S. Steel and the labor union, United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, are parties. (ECF No. 1-3, pp. 2, 11).[1] The BLA "addresses, among other things, union members' hours of work, work time, job duties, and rates of pay," as well as defining "a predetermined amount of compensation to coke plant employees for time spent performing preparatory or closing activities which occur outside of their scheduled shift or away from their worksite." (*Id.* at 2–3).

The BLA lists the following positions and their corresponding duties and responsibilities:

### APPENDIX A-2: JOB DESCRIPTIONS

**Position Title:     Senior Operating Technician**
          **Labor Grade 5**
Operates and is responsible for a major producing unit (such as Hot Strip Mill) as a member of the operating team. Directs other operating and support crew members, performs administrative duties, and communicates with maintenance,

---

[1] A copy of the BLA is attached as Exhibit 1 to U.S. Steel's Exhibit B, Declaration of Rebecca S. Bloom. (ECF No. 1-3).

as required, to maximize production. Performs and assists in production and maintenance tasks and functions necessary to assure maximum production, quality, and inspection. Performs or leads maintenance activities as required with operating crew members and coordinates and works in conjunction with Maintenance Technicians.

**Position Title:       Maintenance Technician (Mechanical or Electrical)**
**Labor Grade 4**
Performs all maintenance functions (mechanical or electrical/electronic) necessary to maintain all operating and service equipment using standard and specialized tools and equipment including mobile equipment as required. Operates equipment in conjunction with repairs and provides assistance in operating functions as necessary to maintain continuity of operations. May work alone, with minimal supervision or with other Maintenance Technicians and coordinates and works in conjunction with operating team members in the performance of maintenance tasks.

**Position Title:       Operating Technician II**
**Labor Grade 4**
Operates and is responsible for a significant producing unit (such as Galvanizing Line) or operates and assists Senior Operating Technician on a major producing unit as a member of the operating team. Directs other operating and support crew members, performs administrative duties, and communicates with maintenance, as required to maximize production. Performs and assists in production and maintenance tasks and functions necessary to assure maximum production, quality and inspection. Performs or leads maintenance activities as required with operating crew members and coordinates and works in conjunction with Maintenance Technicians. Includes hybrid operating/maintenance jobs, such as former Equipment Tender.

**Position Title:       Operating Technician I**
**Labor Grade 3**
Operates and is responsible for producing and support units other than those described above or operates key sections of a producing unit and assists Operating Technician II or Senior Operating Technician as a member of the operating team. Directs support crew members, performs administrative duties, and communicates with maintenance, as required to maximize production. Performs and assists in production and maintenance tasks and functions necessary to assure maximum production, quality, and inspection. Performs or leads maintenance activities as required and coordinates and works in conjunction with Maintenance Technicians.

**Position Title:       Utility Technician**
**Labor Grade 2**
Operates equipment and performs tasks that support operations of the various producing units and works with materials and equipment to handle, transport and

process product and materials. Directs the flow of material to and from producing units and material. Operates equipment associated with producing units such as roll grinders, etc. and operates material handling equipment such as overhead electric cranes, feeders, etc. and mobile equipment such as tractors, trucks, heavy equipment, dozers, loaders, boom trucks, mobile cranes (various sizes and types), etc. Inspects and performs maintenance on all associated equipment.

**Position Title:     Utility Person**
**Labor Grade 1**
Operates equipment and performs tasks such as operating labor, general labor and light mobile equipment operation required to support and maintain Plant operations. Supports and assists in maintenance activities.

. . .

### APPENDIX N—FLSA MATTERS

. . .

The Parties agreed that starting in 1947, every national collective bargaining agreement or BLA negotiated by the Parties has included an agreement that the Company is not obligated to pay Employees for preparatory or closing activities which occur outside of their scheduled shift or away from their worksite (i.e., so-called "portal-to-portal activities"). Such activities include such things as donning and doffing of protective clothing (including such items as flame-retardant jacket and pants, metatarsal boots, hard hat, safety glasses, ear plugs, and a snood or hood), and washing up. Nevertheless, the Parties have agreed to the following, effective with the September 1, 2008 BLA.

1. Coke plant Employees who work in OSHA regulated areas and who are required to shower at the end of their shift will be provided with twenty (20) minutes washup time prior to the end of the Employee's shift, or a daily additive in an amount calculated at four-tenths (0.4) of an hour at the Employee's Base Rate of Pay, at the Company's choice. Existing local practices which may permit more than twenty (20) minutes of such wash-up time shall not be affected by this agreement.

2. The Parties' long-standing agreement described above which makes such portal-to-portal activities non-compensable shall otherwise remain in effect.

. . .

(ECF No. 1-3, pp. 279–281, 301–02).

Guidas alleges that he and the Hourly Employees often worked forty or more hours per workweek and were not properly compensated for all hours worked as required by the PMWA. (ECF No. 1-2, p. 8). He claims that U.S. Steel failed to pay him and the Hourly Employees for activities performed prior to and after the completion of their scheduled shifts. Pre-start time activities include "walking to locker room/changing area from the Plant entrance area; waiting for, gathering, and donning personal protective equipment ("PPE"); [and] walking to assigned work locations." (*Id.* at 8–9). Post-end time activities are the same, but in reverse—*i.e.*, "walking from assigned work locations to the locker room/changing area; doffing and returning PPE; showering; and walking from the locker room/changing area to the Plant exit area." (ECF No. 1-2, pp. 8–9). Guidas alleges that showering is another post-scheduled shift activity for which he and the Hourly Employees did not receive compensation. (*Id.* at 9).

In the BLA, the only pre- or post-shift activity that is stated as a requirement is showering at the end of certain employees' shifts. (ECF No. 1-3, p. 301). This provision states that these particular employees, those "who work in OSHA regulated areas" in the Plant, will be compensated for the time spent showering because these individuals are "required to shower at the end of their shift." (*Id.*).

## II. STANDARD OF REVIEW

A civil action brought in state court can be removed by a defendant to federal district court under the general removal statute: 28 U.S.C. § 1441. Since federal courts are courts of limited jurisdiction, such removal is proper only if a district court would have original subject-matter jurisdiction over the action, either through diversity of citizenship or federal question jurisdiction. 28 U.S.C. § 1441(a); *Emps. Ins. of Wausau v. Crown Cork & Seal Co., Inc.*, 905

F.2d 42, 45 (3d Cir. 1990) (citation omitted). A lack of subject-matter jurisdiction is a mandatory basis for remand. 28 U.S.C. § 1447(c).

The presumption at every stage of litigation is that a district court lacks federal jurisdiction unless proven otherwise. *Lehigh Min. & Mfg. Co. v. Kelly*, 160 U.S. 327, 337 (1895) (internal citation omitted). A defendant retains the overall burden to show by the preponderance of the evidence that subject-matter jurisdiction exists and removal is proper. *Boyer v. Snap-on Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (citations omitted); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936). Doubts as to jurisdiction must be resolved in favor of remand. *See Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 403 (3d Cir. 2004).

Whether a district court has federal question jurisdiction is governed by the "well-pleaded complaint rule," which sets forth that federal jurisdiction "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). A federal defense, including the defense of preemption, is not a basis for removal. *Id.* at 393. However, there is an "independent corollary" to the well-pleaded complaint rule known as the "complete pre-emption" doctrine. *Id.* In these limited circumstances, the preemptive force of a statute is found to be so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). The complete preemption corollary "is applied primarily in cases raising claims preempted by § 301 of the LMRA." *Id.*

The requirements for filing a motion to remand under 28 U.S.C. § 1447(c) parallels the defense requirements of Federal Rule of Civil Procedure 12(b)(1). *See Papp v. Fore-Kast Sales*

*Co., Inc.*, 842 F.3d 805, 811 (3d Cir. 2016) (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 (9th Cir. 2014)). A challenge to subject-matter jurisdiction under Rule 12(b)(1) may entail either a facial or factual attack. *Id.* (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)). In reviewing a facial attack, a court assumes all factual allegations are true. *Id.* (citation omitted). In reviewing a factual attack, a court construes all factual allegations in a light most favorable to the movant as it would otherwise do under Federal Rule of Civil Procedure 12(b)(6). *Id.* (quoting *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n*, 790 F.3d 457, 466 (3d Cir. 2015)); *Leite*, 749 F.3d at 1121 (citing *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013)). In either case, a defendant retains the overall burden of demonstrating that subject-matter jurisdiction exists. *Boyer*, 913 F.2d at 111; *McNutt*, 298 U.S. at 189.

### III. ANALYSIS

Guidas moves to remand this action to the Court of Common Pleas of Allegheny County arguing that U.S. Steel has not demonstrated that his PMWA claim is preempted by the LMRA. (ECF No. 7, p. 1). Guidas contends that his Complaint does not reference the BLA nor imply that U.S. Steel violated the agreement, and thus his claim does not require interpretation of any specific provision contained therein. (ECF No. 8, pp. 11–13); (ECF No. 15, p. 3). He highlights his claim's independence from the LMRA. (ECF No. 15, p. 3). Additionally, he asserts that this suit will be resolved by applying the facts of his employment to the PMWA's statutory language, not the BLA, and that no provision of the BLA needs to be interpreted. (*Id.* at 3–8).

U.S. Steel counters that Guidas's Complaint alleges a violation of the BLA, or stated differently, a claim for breach of the BLA's terms. (ECF No. 13, p. 13). In the alternative, it asserts that to determine whether Guidas is entitled to the alleged compensation, the Court must

7

analyze and interpret the BLA provisions governing Guidas's employment, such as his work schedule, wages, and job description. (*Id.* at 14). U.S. Steel notes that the Court will need to undertake interpretation "to determine whether the activities fit the definition of 'hours worked' under the PMWA." (*Id.* at 17). U.S. Steel also contends that the Court will need to interpret BLA provisions because the agreement is "*not* silent as to the compensation provided for the very activities [Guidas] points to in his Complaint." (*Id.* at 21) (emphasis in original). Based on this, U.S. Steel asserts that Guidas's PMWA claim is preempted by the LMRA, and removal was proper.

As explained below, the Court holds that Guidas's PMWA claim is not preempted by the LMRA.

**A. Relevant Federal and State Law.**

    1. <u>Pennsylvania Minimum Wage Act</u>

The wages of employees in the United States are governed by both federal and state law. The federal Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219, establishes "a national floor under which wage protections cannot drop." *Chevalier v. Gen. Nutrition Ctrs., Inc.*, 220 A.3d 1038, 1055 (Pa. 2019) (quoting *Bayada Nurses, Inc. v. Com. of Pa., Dep't of Lab. & Indus.*, 8 A.3d 866, 883 (Pa. 2010)). But the FLSA does not preclude states from "enact[ing] more beneficial wage and hour laws." *Id.*; *see also* 29 U.S.C. § 218 (providing that the FLSA does not "excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under [the FLSA]"); *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 232 (3d Cir. 2019) (explaining that "the general presumption [is] that the FLSA is a parallel regime of wage-and-hour protections that works in cooperation with, not to the exclusion of, other laws protecting workers").

The Pennsylvania General Assembly endeavored to provide "more generous protections" to employees through enactment of the PMWA. *Chevalier*, 220 A.3d at 1055 (citation omitted). The PMWA "manifests th[e] Commonwealth's strong public policy protecting an employee's right to be adequately compensated for all hours for which they work." *In re Amazon.com, Inc.*, 255 A.3d 191, 200 (Pa. 2021); *see also* 43 P.S. § 333.101 ("The evils of unreasonable and unfair wages as they affect some employe[e]s employed in the Commonwealth of Pennsylvania are such as to render imperative the exercise of the police power of the Commonwealth for the protection of industry and of the employe[e]s employed therein and of the public interest of the community at large."). The PMWA provides that "[e]very employer shall pay to each of his or her employe[e]s wages for all hours worked . . . ." 43 P.S. § 333.104(a). It further provides that employees "shall be paid for overtime not less than one and one-half times the employe[e]'s regular rate . . . for hours in excess of forty hours in a workweek." *Id.* § 333.104(c). The statute does not itself define "hours worked." *In re Amazon.com*, 255 A.3d at 203. But the term has been defined by regulation:

> *Hours worked*—The term includes [1] time during which an employee is required by the employer to be on the premises of the employer, [2] to be on duty or to be at the prescribed work place, [3] time spent in traveling as part of the duties of the employee during normal working hours and [4] time during which an employee is employed or permitted to work; provided, however, that time allowed for meals shall be excluded unless the employee is required or permitted to work during that time, and provided further, that time spent on the premises of the employer for the convenience of the employee shall be excluded.

34 Pa. Code § 231.1(b). According to the plain language of the regulation, "all time which an employee spends performing any one of these four types of activity constitutes hours worked." *In re Amazon.com*, 255 A.3d at 203–04.

2. <u>LMRA Preemption</u>

Section 301(a) of the LMRA provides:

9

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). As interpreted by the Supreme Court, this provision of the LMRA has both a jurisdictional and substantive effect. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 455 (1957); *see also Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 642–43 (1981). First, it vests federal district courts with jurisdiction over certain labor-management disputes. *Textile Workers*, 353 U.S. at 451–52; *see also Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union*, 523 U.S. 653, 656–57 (1998) ("By its terms, this provision confers federal subject-matter jurisdiction only over '[s]uits for violation of contracts.'"). And second, it "authorizes federal courts to fashion a body of federal law for the enforcement of [] collective bargaining agreements and includes within that federal law specific performance of promises to arbitrate grievances under collective bargaining agreements." *Textile Workers*, 353 U.S. at 451; *see also id.* at 456 ("[T]he substantive law to apply in suits under s [sic] 301(a) is federal law, which the courts must fashion from the policy of our national labor laws.").

The need for uniformity gave rise to the doctrine of complete preemption under the LMRA. *See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103–04 (1962) (citation omitted). In defining this doctrine, the Supreme Court explained that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for. S. Cal.*, 463 U.S. 1, 23 (1983) (citation omitted). Accordingly, a suit "alleging a violation of a provision of a labor contract must be brought under § 301 and [] resolved by reference to federal law." *Allis-Chalmers Corp.*

*v. Lueck*, 471 U.S. 202, 210 (1985). And if a "state rule [] purports to define the meaning or scope of a term in a [labor] contract suit," it is "pre-empted by federal labor law." *Id.*

Significantly, LMRA preemption "extend[s] beyond suits alleging contract violations." *Id.* It also applies to state law claims that are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Id.* at 220; *see also Caterpillar*, 482 U.S. at 394 ("Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" (citation omitted)). But such an extension of LMRA preemption is "narrow." *Lueck*, 471 U.S. at 220. "[N]ot every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301." *Id.* at 211. Rather, "it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212; *see also Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994) (stating that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law").

The question thus becomes—as assessed "on a case-by-case basis"—whether the state-law claim "confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the [state law] claim is inextricably intertwined with consideration of the terms of the labor contract." *Lueck*, 471 U.S. at 213, 220. In determining whether a state-law claim is "independent" of a collective bargaining agreement, a court must consider the "legal character of [the] claim" as opposed to its factual underpinnings. *Livadas*, 512 U.S. at 123 (citing *Lueck*, 471 U.S. at 213). In other words, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and

state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409–10 (1988).

Moreover, mere consultation of a collective bargaining agreement does not trigger LMRA preemption. *See Livadas*, 512 U.S. at 124 ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."). "[A]n application of state law is preempted by § 301 of the [LMRA] only if such application requires the *interpretation* of a collective-bargaining agreement." *Lingle*, 486 U.S. at 413 (emphasis added). Under those circumstances, the state-law claim "must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Lueck*, 471 U.S. at 220 (internal citation omitted).

### B. Guidas's PMWA claim is not preempted by the LMRA.

Guidas, on behalf of himself and the Hourly Employees, brings a single claim for unpaid wages under the PMWA for U.S. Steel's alleged failure to compensate for all time associated with activities performed before and after their scheduled shifts. These activities include walking between the locker room/changing area, the Plant entrance or exit area, and the assigned work location; waiting for, gathering, donning, doffing, and returning PPE; and showering. (ECF No. 1-2, pp. 8–9).

To determine whether LMRA preemption applies in this case, the Court first considers whether the PMWA "confers nonnegotiable state-law rights on employers or employees." *Lueck*, 471 U.S. at 213. As discussed above, the PMWA was intended to "protect[] an

employee's right to be adequately compensated for all hours for which they work." *In re Amazon.com*, 255 A.3d at 200; *see also Chevalier*, 220 A.3d at 1055; 43 P.S. § 333.101. To give effect to that right, the PMWA affords an employee a civil cause of action to recover minimum wages. *See* 43 P.S. § 333.113. The PMWA provides supplemental protections in a number of areas where federal law does not extend, such as donning, doffing, sanitizing protective gear, and taking shuttled transportation to and from a work site. *See Larue v. Great Arrow Builders LLC*, No. 2:19cv932, 2020 WL 5747818, at *12 (W.D Pa. Sept. 25, 2020) (colleting cases).

The PMWA further provides that "any agreement between the employer and the worker to work for less than such minimum wage shall be no defense to such action." 43 P.S. § 333.113. In other words, the PMWA expressly states that its protections cannot be waived by contract. *See Verma*, 937 F.3d at 229 ("The whole point of . . . the PMWA is to protect workers by overriding contractual relations through statute."); *Larue*, 2020 WL 5747818, at *11 ("The rights afforded to employees under the PMWA are independent of any contract rights arising under the CBA."). Therefore, the PMWA confers nonnegotiable rights—as explicitly detailed by the text and purpose of the PMWA—that employees are due the minimum amount of wages owed to them for their work. Guidas's claim is grounded entirely upon U.S. Steel's alleged failure to pay wages owed to him and the Hourly Employees for all hours worked and thus triggers these nonnegotiable rights.

But the fact that a state law "grant[s] nonnegotiable rights" does not, by itself, "ensure[] nonpre-emption." *Lingle*, 486 U.S. at 407 n.7. Rather, such rights must also be "independent of any right established by contract," *Lueck*, 471 U.S. at 213, meaning adjudication of the state-law claim will not require "interpretation of a collective-bargaining agreement," *Lingle*, 486 U.S. at 413; *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 256 (3d Cir. 2004) (emphasis in original) (citation

omitted) ("[T]he essential question is not whether [a plaintiff's] claims relate to a subject . . . contemplated by the CBA. . . . Rather, the dispositive question [] is whether [the] state claims require any *interpretation* of a provision of the CBA."). Interpretation is warranted when the parties have a specific dispute over the meaning of the agreement's terms or provisions. *Malone v. United Parcel Serv., Inc.*, No. 21-3643, 2023 WL 3362588, at *6 (E.D. Pa. May 9, 2023) (citations omitted); *Mack v. Six Flags Great Adventure, LLC*, No. 23-3813, 2024 WL 69879, at *5 (D.N.J. Jan. 5, 2024) (citation omitted).

Mere consultation of an agreement does not necessitate interpretation of the applicable employment contract or collective bargaining agreement in every case. A court may have to look to the agreement to determine an employee's required activities and duties. *See Pa. Fed'n of Brotherhood of Maint. of Way Emps. v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 989 F.2d 112, 115 (3d Cir. 1993); *Smith v. Allegheny Techs., Inc.*, 754 F. App'x 136, 141 (3d Cir. 2018). Additionally, a court may need to consider the fact and circumstances beyond the four corners of a written contract to determine an employer's requirements. This especially is the case when an employment agreement is silent (rather than ambiguous) as to certain job requirements. *See Kline*, 386 F.3d at 256. A court cannot be said to "interpret" an agreement by making a determination of silence and then looking to external, non-contractual sources of those alleged requirements. *Id.* ("[T]he mere fact that we must look at the CBA in order to determine that it is silent on any issue relevant to [a plaintiff's] state claims does not mean that we have 'interpreted' the CBA.").

To prevail on a PMWA claim, a plaintiff must demonstrate that (1) he and the Hourly Employees were "employees," (2) U.S. Steel was their "employer," and (3) U.S. Steel failed to pay them the wages required by the PMWA. *See* 43 P.S. §§ 333.103, 333.104. Resolution of the

first two elements (which are inherently related) will not require any interpretation of the BLA. *See Soles v. Zartman Constr., Inc.*, No. 4:13-cv-29, 2014 WL 3557197, at *2 (M.D. Pa. July 18, 2014) ("Whether a worker is an 'employee' subject to the protections of the PMWA is a fact-based inquiry regardless of what a contract says and even whether a contract exists at all."). To determine employee-employer status, courts must consider the "totality of the circumstances" and apply a six-factor "economic reality" test. *Pa. Dep't of Lab. & Indus., Bureau of Lab. L Compliance v. Stuber*, 822 A.2d 870, 873–74 (Pa. Commw. Ct. 2003); *see also Verma*, 937 F.3d at 229. Notably, "none of [the six] factors asks whether the worker signed an agreement stating that she is an 'independent contractor'" or an employee. *Verma*, 937 F.3d at 229. As such, the Court finds that application of the "economic reality" test to determine whether Guidas and the Hourly Employees were U.S. Steel's employees will not require interpretation of any provision of the BLA. Indeed, the BLA is largely—if not entirely—irrelevant to this inquiry.

The parties' arguments are focused on the resolution of the third element. Under the PMWA, employers must pay every employee "wages for all hours worked." 43 P.S. § 333.104(a). As defined by regulation, "hours worked" includes (1) time during which an employee is required by the employer to be on the employer's premises, (2) to be on duty or to be at the assigned workplace, (3) time spent traveling as part of the employee's duties during normal working hours, and (4) time during which an employee is employed or permitted to work. 34 Pa. Code § 231.1(b).

U.S. Steel first contends that Guidas "is trying to disguise his LMRA claim as a PMWA claim" because he alleges violations of specific terms of the BLA. (ECF No. 13, pp. 12–13). It notes that the BLA provides compensation for time that Plant employees spend on post-liminary activities outside of their normally scheduled shifts. (*Id.* at 13). Since the contract explicitly

details this compensation metric, U.S. Steel argues that Guidas's allegations that he and the Hourly Employees are not paid for "all time" associated with activities performed before and after their scheduled shifts is a claim for breach of a term of the BLA. (*Id.*). Therefore, U.S. Steel asserts that § 301 preemption applies, and removal is proper. (*Id.*).

If not a breach of a BLA term, U.S. Steel alternatively asserts that determining whether Guidas and the Hourly Employees are entitled to compensation for the pre- and post-shift activities allegedly performed "requires the Court to determine whether [U.S. Steel] required [Guidas] to perform those activities at the workplace or while on duty," necessitating it to analyze and interpret the applicable BLA provisions. (*Id.* at 14). Specifically, U.S. Steel contends that the BLA outlines what constitutes hours worked and the job duties of hourly employees. (*Id.* at 16). It argues that Guidas's claim is inextricably linked to BLA provisions, and the Court will need to interpret sections "to determine whether the activities fit the definition of 'hours worked' under the PMWA." (*Id.* at 17–18).

In response, Guidas asserts that his Complaint does not mention, reference, or allege any violation of a BLA term. (ECF No. 8, p. 11); (ECF No. 15, p. 9). Instead, Guidas argues this his PMWA claim "exists independently of the contractual provisions within the BLA." (ECF No. 15, p. 9). Additionally, he contends that "while the parties may potentially need to ***consult*** the BLA, [his] PMWA claim will ***not*** require an ***interpretation*** of the provisions cited by [U.S. Steel] to resolve its merits." (*Id.* at 5) (emphasis in original). This, Guidas contends, is because the BLA is "'silent' as to whether any of the challenged pre and post-shift activities were required to be performed on the premises of the Plant." (*Id.*). Guidas also asserts that even though the BLA states that U.S. Steel is not obligated to pay employees for preparatory or closing activities that occur outside of their scheduled shift or away from their worksite, the BLA

is effectively silent as to whether these activities would qualify as compensable hours worked under the PMWA. (*Id.* at 6).

Upon careful review of the BLA, the Court concludes that Guidas does not allege a claim for breach of any BLA term. Nor does it find Guidas alleges that any relevant provisions of the agreement require interpretation. The Court holds that Guidas's claim is "independent" of the BLA. Resolution will require a factual determination of the amount of time the employees worked at the beginning and end of the workday and a legal determination of whether such time is compensable under the PMWA. *See Bell v. Se. Pa. Transp. Auth.*, 733 F.3d 490, 495 (3d Cir. 2013). Therefore, his claim is not preempted by the LMRA.

The Court does not find that Guidas's claim is one for breach of a BLA term, as U.S. Steel argues. Guidas does not seek to recover based on any right included within the four corners of the BLA. *See Larue*, 2020 WL 5747818, at *15 ("[I]t would be disingenuous to ignore the fact that plaintiff does not seek to recover based on a right or form of entitlement under the CBAs."). Rather, his PMWA claim is grounded entirely on U.S. Steel's alleged violation of his statutory rights. It is not enough for there to exist a *potential* claim for breach of an applicable collective bargaining agreement from the same set of facts. *Id.* (emphasis added) (citing *Lingle*, 486 U.S. at 409–10). Therefore, that the BLA contains provisions that provide compensation for certain Plant employees—those that are required to shower at the end of their scheduled shifts—does not automatically preempt Guidas's state law claim for unpaid wages. *Id.*; (ECF No. 1-2, p. 9).

Guidas's claim will require applying certain facts in conjunction with the PMWA's "hours worked" provision. No interpretation of the BLA will be necessary. A court may, however, need to consult the BLA's provisions "to consider whether the activities at issue are

clearly excluded from the [employees'] workday." *Ballard v. BHI Energy, Inc.*, No. 22-115, 2022 WL 4464959, at *6 (W.D. Pa. Sept. 26, 2022). But this alone "does not equate with 'interpreting' the CBA to determine whether such activities constitute compensable time under the PMWA." *Id.*

Specifically, a court may need to consult Appendix N—FLSA Matters, which sets forth the agreement reached related to certain "portal-to-portal activities." (ECF No. 1-3, pp. 139–40). The provision explicitly states that U.S. Steel is "not obligated to pay [e]mployees for preparatory or closing activities which occur outside of their scheduled shift or away from their worksite," listing donning and doffing of protective clothing and washing up as examples. (*Id.* at 140). It then specifies the one exception to this—Plant employees "who work in OSHA regulated areas" are required to shower and will be compensated for doing so. (*Id.*). Guidas alleges that showering after scheduled shifts is an activity for which he and the Hourly Employees did not receive compensation. (ECF No. 1-2, p. 9). Because the BLA explicitly provides compensation for post-shift showering, U.S. Steel asserts that Guidas's corresponding claim would require interpretation of the BLA. (ECF No. 13, p. 19). The Court disagrees. Resolution of Guidas's claim related to post-shift showering would require mere consultation of the BLA, not interpretation. The parties do not dispute the meaning of the provision. *See Malone*, 2023 WL 3362588, at *6 (citations omitted); *Mack*, 2024 WL 69879, at *5 (citation omitted). A court will have to make a factual determination as to whether U.S. Steel paid Guidas and the Hourly Employees for their required post-shift showers based on the unambiguous terms stated on the face of the BLA.

Related to the other activities Guidas alleges went uncompensated—walking within the Plant as well as donning and doffing PPE—the BLA is silent. There are no terms or provisions

contained therein which set forth whether any of the challenged pre- or post-shift activities are required, and thus are compensable "hours worked." In other words, with respect to the third element of Guidas's PMWA claim, there is nothing in the BLA for a court to interpret. Resolution of this element will ultimately require a court to look beyond the BLA. That task, as explained above, will not involve contractual interpretation because the determination will be made by looking at the facts and circumstances of the employment.

In the absence of any required interpretation of a collective bargaining agreement, the doctrine of complete preemption under the LMRA is inapplicable. *See Lingle*, 486 U.S. at 413 ("[A]n application of state law is pre-empted by § 301 of the [LMRA] only if such application requires the interpretation of a collective-bargaining agreement."); *Kline*, 386 F.3d at 257 ("The fact that a collective bargaining agreement [is] part of the context in which an employee's claim must be addressed [does] not trigger complete preemption in the absence of some substantial dispute over the meaning of the collective bargaining agreement."). The Court, therefore, concludes that Guidas's PMWA claim is not preempted by the LMRA, and the case will be remanded.

## IV.     CONCLUSION

For the foregoing reasons, the Court will grant Guidas's Motion to Remand to State Court (ECF No. 7). U.S. Steel's Motion to Dismiss (ECF No. 10) will be denied as moot. An Order of Court will follow.

BY THE COURT:

_____
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

Dated:

__5/28/24_____